United States District Court
Eastern District of New York                                                     1:18-cv-05188

Sean Duffy individually and on behalf of all
others similarly situated

                         Plaintiff

            - against -                                                    Complaint

Core Nutrition, LLC

                        Defendant

Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Core Nutrition LLC ("defendant") manufactures, distributes, markets, labels and sells bottled water products under the "Core Hydration" line in various sized bottles, including 20 oz (591 mL).

2. The Products emphasize their ability to provide hydration beyond that supplied by non-Core Hydration products, due to its purported pH level.

3. The below images are examples of a bar and pieces product label.

4. The principal display panel contains the product name, "Core Hydration," and the identity statement/description of the product as "Nutrient Enhanced Perfect pH* Water with Electrolytes & Minerals."

5. The asterisk refers to the "Perfect pH: 7.4* - your body's natural pH balance."



6. The supplemental panel of the Products state:

The pH that naturally occurs in your body happens to be perfect, so it should come as no surprise that we mirrored our water after it.

core® hydration is ultra purified for a clean, crisp taste and has just the right amount of electrolytes & minerals to match your body's natural pH of 7.4...or simply put - the Perfect pH.

So, no matter what you do to get thirsty, hydrate with Core® and feel the benefits of Perfect pH Water.

7. The side panel of the Products states, "Electrolytes + minerals for hydration and balance."

8. Defendant claims the Product contains "electrolytes + minerals, for hydration and balance" referring to "your body's natural pH balance" of 7.4.

9. Defendant utilizes the plus symbol, a universal sign of gaining health.

10. The product name, "Core Hydration," implies and suggests a special, targeted hydration benefit.

11. The dictionary defines core as the central, innermost or most essential part of anything.

12. "Core" is also used synonymously with "magnetic core," which refers to electricity, *viz*, the piece of iron, bundle of iron wires, or other ferrous material forming the central or inner portion in an electromagnet, induction coil, transformer, or the like.

13. The second definition is relevant because the product can be described as electrolyzed-reduced alkaline water.

14. Reasonable consumers understand core as a term of scientific significance, such as "core temperature" and the term "core hydration" implies the regulation and special benefits the product provides to said core.

15. The idea behind the defendant's "Perfect pH Water" is that foods which contain acid-producing elements will generally lead the body to become acidic, with consequent negative outcomes.

16. Advocates for consumption of foods which are alkaline claim that since the normal pH of the blood is slightly alkaline (above 7 on a scale of 0-14), one should consume foods which mirror this pH level – foods considered to be alkaline.

17. The notion that people should consume foods with a certain pH level to achieve optimal functioning is at odds with medical science and chemistry of how the human body functions.

18. Defendant utilizes the plus symbol a universal sign of gaining health, when the product is no different in the claimed effect than any bottled or tap water.

19. Defendant claims that because the product has the same pH as the body, this imparts an extra-functional benefit to its product.

20. To reasonable consumers, this would appear to be something of value, when in fact, it is of no significance because those benefits are physiologically impossible to provide.

21. All consumed food travels to the highly acidic stomach, with a pH of c. 3.0.

22. The low pH is necessary to break it down and sterilize any bacteria ingested.

23. After leaving the stomach, the matter goes to the intestines where it is neutralized and slightly alkalized by pancreatic solutions.

24. As a result, everything consumed - once it gets to the intestines–is roughly the same pH, regardless of its pH at the time it was consumed.

25. The most that consumption of foods which are alkaline can do is to change the pH of the blood minimally and transiently.

26. If the pH of blood changes in even a small way, it will cause serious medical disturbances requiring hospitalization.

27. If the blood pH is lower than 7.35 the medical term is acidemia (acidosis), and when exceeding 7.45, is called alkalemia (alkalosis).

28. Whenever the blood pH is abnormal, the body uses multiple lines of defense to restore a normal blood pH:

1. biochemical buffering systems operating in both the extracellular and intracellular compartments act immediately to prevent excessive fluctuations of the blood pH.

2. Alveolar ventilation increases in acidosis and decreases in alkalosis. The respiratory center in the medulla oblongata of the brain responds to pH and CO2 within minutes.

3. The kidneys excrete excess H+ in acidosis and excess HCO3- in alkalosis. This involves modulation of the renal tubular reabsorption or 'reclamation' of filtered bicarbonates and proton secretion. This is a long-term mechanism acts on a time scale of hours to days.

29. Extracellular levels of other ions such as Na, K, Ca and inorganic phosphate are also barely affected by fluctuations in their respective nutritional intakes, unless their variations are very large in quantity and extend over prolonged periods.

30. The promotion of the Products as matching the pH of the body is meaningless, because it is not expected that human beings can nor should attempt to match the pH of what they consume to the pH level of their blood.

31. The only impact of consuming a product with a pH of 7.4 would be to alter the pH of the excreted urine to be more or less alkaline, depending on whether one's dietary habits tend to the more acidic or alkaline.

32. However, urine is not blood, since it is contained in the bladder and then excreted.

33. Moreover, significant amounts of the Product would have to be consumed to even achieve such a transient change in the pH of the blood, which would be almost impossible to do in a short period of time before the body adjusts the pH back to its normal level.

34. To the extent the Products emphasis on the hydration-promoting properties of alkaline water is based on its ability to reduce blood viscosity and somehow increase hydration is not physiologically possible because blood viscosity is not impacted by discrete nutritional disturbances from consuming a non-medicinal beverage.

35. The claims are literally false because all reasonable scientists agree the claims of relationship between consumption of alkaline foods and the pH level of blood are non-existent.

36. The claims are misleading because the vast weight of competent evidence about mammalian physiology indicates there is no non-medically induced way to adjust the pH level of the blood to achieve an "optimal" state, nor should such adjustment be attempted unless directed by a physician.

37. Any studies purporting to substantiate defendant's claims are poorly designed, incredible and represent the view of a minority of scientists.

38. Defendant's representations that its Product is any more effective at providing hydration than other non-alkalinized, non-reduced waters, due to its pH level, are false and misleading.

39. There can never be any competent and reliable scientific evidence supporting Defendant's representations and Defendant cannot claim, to the extent it does, that its Product is clinically tested.

40. The Products are contained in refrigerated cases adjacent to the non-alkaline water, which facilitates obtaining a price premium relative to the non-alkaline waters.

41. Defendant market their product as a superior source of hydration worthy of a premium price over other bottled water.

42. Excluding tax, the Products cost no less than $2.99, a premium price compared to other similar products and more expensive than traditional bottled waters.

## Jurisdiction and Venue

43. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

44. Upon information and belief, the aggregate amount in controversy is more than

6

$5,000,000.00, exclusive of interests and costs.

45. This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

46. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

47. A substantial part of events and omissions giving rise to the claims occurred in this District.

## Class Allegations

48. The classes consist of all consumers in the following states: <u>all</u>, <u>New York</u> who purchased any Products with actionable representations during the statutes of limitation.

49. A class action is superior to other methods for fair and efficient adjudication of this controversy.

50. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

51. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

52. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

53. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

54. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

55. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

56. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

57. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

## Parties

58. Plaintiff is a citizen of Queens County, New York.

59. Defendant is a Delaware limited liability company with its principal place of business in El Segundo, California, and upon information and belief, no member thereof is a citizen of New York.

60. In 2017, plaintiff purchased one or more of the Products for personal consumption, for no less than $2.99, excluding tax, at a store located within this district.

61. Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

## New York General Business Law ("GBL") §§ 349 & 350

62. Plaintiffs incorporates by references all preceding paragraphs.

63. Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

64. Plaintiff desired to purchase products which provided the benefits described by defendant.

65. Defendant's representations are false, unfair, deceptive and misleading for the reasons described herein.

66. The representations and omissions were relied on by plaintiff and class members, who paid more than they would have otherwise, causing damages.

Negligent Misrepresentation

67. Plaintiff incorporates by references all preceding paragraphs.

68. Defendant misrepresented the ability of the Products to achieve the claimed effects.

69. Defendant had a duty to disclose, in a manner prescribed by law, that its Products were not capable of providing said effects.

70. At the time of the representations, defendant knew or should have known same were false or misleading.

71. Defendant negligently misrepresented and/or negligently omitted material facts.

72. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

73. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

Breach of Express Warranty and Implied Warranty of Merchantability

74. Plaintiff incorporates by references all preceding paragraphs.

75. Defendant manufactures and sells bottled waters which have been electrolyzed and have a higher pH level than standard bottled or tap water.

76. Defendant warranted to plaintiff and class members that the Products were superior to non-alkaline waters in providing hydration, due to mirroring the pH of the body, when this was not truthful and was misleading.

77. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

78. Plaintiff and class members relied on defendant's claims, paying more than they would have otherwise.

Fraud

79. Plaintiff incorporates by references all preceding paragraphs.

80. Defendant's purpose was to mislead consumers who seek foods which have a functional and beneficial effect.

81. Defendant is capitalizing on consumer's shift from sugary juices and carbonated soft drinks to calorie-free beverages with beneficial properties.

82. Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have otherwise, entitling them to damages.

Unjust Enrichment

83. Plaintiff incorporates by references all preceding paragraphs.

84. Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of such inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE,** plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant(s) to correct such practices to comply with the law;

3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;

4. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and

experts; and

5. Such other and further relief as the Court deems just and proper.

Dated: September 14, 2018

          Respectfully submitted,

          Sheehan & Associates, P.C.
          /s/Spencer Sheehan

          Spencer Sheehan
          891 Northern Blvd., Suite 201
          Great Neck, NY 11021
          Tel: (516) 303-0552
          spencer@spencersheehan.com

          Levin-Epstein & Associates, P.C.
          /s/Joshua Levin-Epstein

          Joshua Levin-Epstein
          1 Penn Plaza, Suite 2527
          New York, NY 10119
          Tel: (212) 792-0046
          joshua@levinepstein.com

1:18-cv-05188
United States District Court
Eastern District of New York

Sean Duffy individually and on behalf of all others similarly situated

Plaintiffs

- against -

Core Nutrition, LLC

Defendant(s)

## Complaint

Sheehan & Associates, P.C.
891 Northern Blvd., #201
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: September 14, 2018

/s/ Spencer Sheehan<br>Spencer Sheehan